```
 1  DAVID R. WEINSTEIN (State Bar No. 082881)
    SHARON Z. WEISS (State Bar No. 169446)
 2  WEINSTEIN, WEISS & ORDUBEGIAN LLP
    1925 Century Park East, Suite 1150
 3  Los Angeles, California 90067-2712
    Telephone (310) 203-9393
 4  Facsimile (310) 203-8110
    dweinstein@wwolawyers.com
 5  sweiss@wwolawyers.com

 6  Attorneys for T. Scott Avila,
    Creditor Trustee of the Class IV Creditor Trust
 7
```

FILED SD
2008 MAY 23 AM 11:33
U.S. BANKRUPTCY CT.
CLERK
SO. DIST. OF CALIF.

104

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>STEAKHOUSE PARTNERS, INC., a Delaware corporation,<br><br>　　　　Debtor. | Case No. 08-04147-11<br>[Chapter 11] |
| In re:<br><br>PARAGON STEAKHOUSE RESTAURANTS, a Delaware corporation,<br><br>　　　　Debtor. | Case No. 08-04152-11<br>[Chapter 11] |
| In re:<br><br>PARAGON OF MICHIGAN, INC., a Wisconsin corporation,<br><br>　　　　Debtor. | Case No. 08-04153-11<br>[Chapter 11]<br><br>CREDITOR TRUSTEE'S OMNIBUS OBJECTION TO DEBTORS' FIRST DAY MOTIONS; DECLARATION OF T. SCOTT AVILA IN SUPPORT THEREOF<br><br>DATE:　May 27, 2008<br>TIME:　10:30 a.m.<br>PLACE:　Courtroom 218<br>　　　　West F Street<br>　　　　San Diego, CA 92101<br><br>Judge:　The Honorable James W. Meyers |

h:\h\c\1570.081_obj.first.day.mtn.wpd
5/23/08 (10:31 am)

ORIGINAL

TO:     THE HONORABLE JAMES W. MEYERS, UNITED STATES BANKRUPTCY JUDGE AND ALL OTHER PARTIES IN INTEREST:

## I.
## INTRODUCTION

T. Scott Avila[1] is the Creditor Trustee of the Class IV Creditor Trust (the "Creditor Trustee"). As acknowledged by them, the Debtors owe the Creditor Trustee more than $ 4 Million which is secured by the Debtors' leasehold interest and intellectual property. The Creditor Trustee is the largest secured claimant in these bankruptcy estates and the funds are specifically earmarked for the Class IV Creditor Trust, the beneficiaries of which are all of the unsecured creditors with claims in excess of $4,000 of the Debtors' previous bankruptcy proceedings.[2] The Class IV Creditor Trust was created in connection with the Debtors' confirmed plan of reorganization in its prior bankruptcy cases.[3] The extent and perfection of the secured claim has been approved by the Bankruptcy Court and acknowledged by the Debtors in a court-approved settlement entered on August 10, 2006 and the forbearance agreement they executed in June 2007.

As part of the Debtors obligations to the Creditor Trustee, they are required to provide a regular status of their finances and their progress towards selling their stores. While reports have been forthcoming, the Creditor Trustee was not advised of

---

[1]     Mr. Avila is a managing partner with CRG Partners. He has more than 20 years of management and consulting experience and a seasoned restructuring professional. Mr. Avila helps operationally and financially distressed organizations through out-of-court workouts and Chapter 11 reorganizations. Further information regarding Mr. Avila's qualifications is located at http://www.crgpartners.com/professionals/avila_s.html.

[2]     The Class IV Creditor Trust does not include a convenience class that was established under the Plan and the responsibility of the Debtor.

[3]     RS 02-12648-MG; RS 02-12682-MG; RS 02-12684-MG; RS 02-12688-MG; and RS 02-12692-MG.

the extent of the Debtors' current liquidity crisis until the day of the filing of this bankruptcy petition. The Creditor Trustee is extremely concerned that the Debtors will not have sufficient cash to survive in chapter 11, thus putting at risk the Creditor Trustee's collateral. The Creditor Trustee, with the Debtors' consent, has reviewed the Debtor's books and records and is in the process of creating its own 13 week cash projection. Until the Creditor Trustee can complete his analysis, the Creditor Trustee respectfully requests that this case proceed with extreme caution, especially to the extent the Debtor is spending cash, and that the Court restrict the Debtor's spending to the most narrow definition of necessity so that the Debtors can literally keep the lights on while being as conservative as possible - - at least for a short period of time - - until the Creditor Trustee has sufficient information to make an independent recommendation to this Court.

## II.

## FACTUAL BACKGROUND

On February 15, 2002, Steakhouse Partners, and on February 19, 2002 Paragon Restaurants and Paragon Michigan filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court entered an order directing the joint administration on February 22, 2002. Steakhouse Partners, Paragon Restaurants, and Paragon Michigan filed a First Amended Joint Plan of Reorganization of Steakhouse Partners, Inc. et al, dated September 29, 2003 and amended November 4, 2003 (the "Plan"). The Court entered an order confirming the Plan on December 19, 2003.

The Plan provided for the creation of the Steakhouse Partners Class IV Creditors Trust (the "Class IV Trust") for the purpose of collecting, maintaining and distributing the Steakhouse Partners Class 4 Creditors Trust Assets. The trust assets consisted of (i) a $1 million payment within thirty (30) days of the Plan's effective date; (ii) payments under the Class 4 Creditors Note in the principal amount of $5,030,000, and secured by the Class 4 Creditors Note Security Documents; (iii)

500,000 shares of the New Common Stock representing ten percent (10%) of the New Common Stock; and (iv) Litigation Claims. The Class IV Trust was also entitled to a one-time payment of $17,000 on the Plan's Effective Date relating to reimbursement of some costs. The Plan became effective on December 31, 2003.

On or about December 31, 2003, T. Scott Avila accepted the appointment as the Creditor Trustee of the Class IV Trust. Prior to May 2007 (as explained in more detail below), the Debtors only made limited payments to the Creditor Trust under the original Plan and Class IV Note (totaling only $1,192,000.00). The Creditor Trustee and the Debtors engaged in extensive negotiations to settle the Debtors' failures under the Class IV Note and Security Agreement. The Creditor Trustee and the Debtors ultimately negotiated a settlement agreement which was approved by the bankruptcy court on August 10, 2006.

The material terms of the compromise required a lump sum payment of $4,126,159 (the "Lump Sum Settlement Payment"). The Settlement Payment represented 85% of the outstanding balance of the original note at that time. However, if the Lump Sum Settlement Payment was not made within 20 days from the entry of the court's order, then the Settlement Agreement also provided for an alternative provision. The Alternative Settlement Payment required the Reorganized Debtors to pay $5,200,000, with $1,100,000 to be paid immediately upon default (with an additional $100,000 that was due June 30, 2006 if this alternative was implemented). The remaining $4,100,000 would be payable over five years, secured by a Note and Security Agreement. The Reorganized Debtors would also be responsible for additional fees and expenses of the Creditor Trustee, including attorneys' fees.

The Debtors failed to tender the Lump Sum Settlement Payment. After insuring that the Creditor Trust was properly secured against the new collateral provided for under the settlement, the Creditor Trustee served a Notice of Default on September 19, 2006, which thus triggered the "Alternative Payment". The

Alternative Payment required the Debtors to pay the Creditor Trustee a total of $5,120,419.03 (plus other sums to the Creditor Trustee and for attorney fees, as provided for in the Agreement).

As part of the Revised Payment Plan, the Debtors were required to deposit $1 million in a separate, segregated, interest bearing account, on or before January 11, 2006 (the "Deposit"). Within two business days after the Creditor Trustee's written notice triggering the Alternative Payment, the Debtors were required to tender i) the Deposit; ii) all accrued interest, and iii) an additional $200,000 to the Creditor Trust. This provision was not subject to cure and failure to comply was considered an Event of Default. Not only did the Debtors fail to comply, the Creditor Trustee later learned that the Debtors used the Deposit to fund the operating losses of the business when the Debtors' plan to sell and leaseback new restaurants failed. They did so without any notice to the Creditor Trustee and certainly without his permission.

On Friday, February 2, 2007, the Creditor Trustee (and his professionals) met with Stone Douglass (and his professionals) to review the status of the proposed financing of Steakhouse restaurants and the subsequent funding to the Class IV Creditors Trust. The Creditor Trustee was informed that the funding had not closed and that a closing could no longer be expected.

As a result, the Creditor Trustee began to actively enforce his rights under the Security Agreement. The Creditor Trustee was appointed to the Debtors' board of directors; the Debtors agreed to employ an Investment Banker to explore a sale of assets; and the Creditor Trustee retained a restaurant expert to review a few of the locations (Carvers and Hungry Hunter), with the purpose to provide an opinion on the best possible process to monetize these assets. Steakhouse also agreed to reimburse the Trust of professional fees incurred going forward, but the Debtors have not paid those expenses to date.

Shortly after his appointment to the board of directors, the Creditor Trustee resigned because he was justifiably concerned that his new duties to the board may

conflict with his duties to the Creditor Trust. However, the Debtors had provided marketing information to the Creditor Trustee (or his representative) every week.

On or about May 18, 2007, the Creditor Trustee properly sent a notice to the Debtors that they were in default under the Alternative Payment as well. Because the Debtors were not entitled to cure the payment of the Deposit, the Debtors were in material default as of September 21, 2006.

After consulting with the "Largest Creditors" of the Creditor Trust, the Creditor Trustee provided the Debtors with two alternatives: either the Debtors must execute a forbearance agreement with the Creditor Trustee by June 15, 2007 or the Creditor Trustee will file a motion seeking to convert the chapter 11 case to chapter 7 due to a material default under the plan. The Debtors in fact executed the forbearance agreement with minor modifications. Under the forbearance agreement, the Debtors were required to either make cash payments by certain trigger dates, or have entered into asset purchase agreements for the equivalent amount by the same trigger dates. The Debtors complied with the forbearance agreement to the extent that they entered into the assets purchase agreements, and monetized approximately $928,000 to the Creditor Trustee.

On or about December 19, 2007 the Creditor Trustee distributed approximately $925,000 to his beneficiaries. Approximately $4.1 Million remains outstanding, plus attorneys fees, interest and expenses.

III.

**THE CREDITOR TRUSTEE'S LIMITED OBJECTION TO MOTION NUMBER 3 FOR ORDER AUTHORIZING PAYMENT OF NON-INSIDER PRE-PETITION ACCRUED WAGES, SALARIES, COMMISSIONS ETC.**

As correctly noted by the Debtors, whether the Court should permit the payment of pre-petition compensation is governed by the necessity doctrine. As discussed in *In re NVR L.P.*, 147 B.R. 126, 127-128 (Bkrtcy.E.D.Va.,1992):

> Section 105(a) of the Bankruptcy Code empowers the court to "[i]ssue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. Under 11 U.S.C. § 105 the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor. *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr.S.D.N.Y.1989). However, section 105 may not be used as a vehicle to discriminate among priority claims when there is no compelling business need for such discrimination. *Id.* While pre-petition claims are normally disposed of in a plan for reorganization and in accordance with statutory priorities, the "necessity of payment" rule is a narrow exception well-established in bankruptcy common law. *See e.g., In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr.W.D.La.1989). *See also* Russell A. Eisenberg and Frances F. Gecker, *The Doctrine of Necessity and Its Parameters*, 73 Marq.L.Rev. 1 (1989) (footnotes omitted).
>
> To justify the pre-plan payment of a pre-petition obligation the proponent of the payment must show substantial necessity. By definition, the "necessity of payment" rule is a rule of necessity and not one of convenience. For example, some courts have stated the payment must be "critical to the debtor's reorganization," "indispensably necessary" to continuing the debtor's operation, or "necessary to avert a serious threat to the Chapter 11 process." In short, the payment must not only be in the best interest of the debtor but also in the best interest of its other creditors. *See In re UNR Industries, Inc.*, 143 B.R. 506, 520 (Bankr.N.D.Ill.1992); Eisenberg & Gecker, *The Doctrine of Necessity and Its Parameters*, 73 Marq.L.Rev. 1, 20 (1989). Accordingly, NVR must articulate a compelling business justification, other than mere appeasement of a major creditor, for making the proposed payment to Berghold. *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175.

*In re NVR L.P.*, 147 B.R. 126, 127 -128 (Bkrtcy.E.D.Va.,1992)

While the Creditor Trustee, in concept, does not object to the payment of certain pre-petition employee wage claims and benefits, it is entirely unclear how much the requested expenses will cost. The Debtors explain that there are 1,325 employees and that it will not pay more than a cumulative amount of $10,950 per employee. Although the Debtors claim they expect to pay less than $10,950 per employee, they never quantify how much will be paid in total. In essence, the Debtors are requesting permission to immediately pay up to $14,508,750 for pre-petition

unsecured claim without any evidence that the Debtors can afford such an enormous expenditure. See Motion 3, p. 17: 13-18. Wulkowicz Decl. ¶¶ 30, 37.

There is also no evidence that these employees are still employed with the Debtors. The Creditor Trustee is informed that the Debtor has closed at least two (2) locations on Tuesday, May 20, 2008 and that they are considering whether other stores should be closed immediately. To the extent that any employee is no longer employed by any of the Debtors, then there is no necessity to pay that employee at this time. Rather, that employee should not receive any pre-petition payment prior to plan confirmation. The Creditor Trustee requests that the order specifically exclude any and all employees that are not currently employed by one of the Debtors.

Moreover, the Debtors should not be permitted to pay any compensation tied to performance. When added together, the pre-petition performance based request accounts for $186,871. The Debtors explain that they have not paid any performance based "wages for the periods 12/2007 and periods 1, 2, 3 and 4/2008, each of which is currently due and/or payable." Motion 3, p. 11: 7-23; Wulkowicz Decl. ¶ 39. There is no specific explanation why these long overdue payments must be made now in order to maintain employee confidences and loyalties. At the very least, approval of the performance based compensation should wait until the Creditor Trustee concludes his investigation of the Debtor's cash position and 13 week cash projections.

Similarly, although the amount is fairly nominal ($10,000), there is no necessity - - right now - - to permit reimbursement of expenses. According to the Wulkowicz declaration, there is a built in lag period for the reimbursement of such expenses. Wulkowicz Dec. 12, ¶ 3.[4] Like the performance based compensation, the

---

[4] "Employees are reimbursed upon the submission of expense reports and supporting documentation. Such reports are *normally* submitted within two weeks after the employee incurs the expense and, after review and approval of the expense report, the Debtors reimburse the employee by check drawn on the Union Bank Concentration Account." (emphasis added)
(continued...)

1  Debtors' request to reimburse expenses should be revisited after the Creditor Trustee
2  concludes his investigation.

## IV.

## THE CREDITOR TRUSTEE'S LIMITED OBJECTION TO MOTION NUMBER 5 FOR ORDER AUTHORIZING PAYMENT OF PRE-PETITION ACCRUED UTILITY SERVICES ETC.

As indicated with respect to pre-petition wages, the Debtor should only be permitted to pay prepetition accrued utility services for locations that are operating. To the extent that the Debtors have closed any stores, or intend to close stores within the next few days, they should not be permitted to pay pre-petition utilities.

## V.

## THE CREDITOR TRUSTEE DOES NOT OBJECT TO SOME OF THE DEBTOR'S FIRST DAY MOTIONS.

The Creditor Trustee does not object to the following first day motions:

1. First Day Motion No. 1: Motion for Order Directing Joint Administration of Related Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) and Local Bankruptcy Rule 1015-1.

2. First Day Motion No. 2: Motion for Order Limiting Scope of Notice (this Motion was previously approved by the Court with the Creditor Trustee's consent).

3. First Day Motion No. 4: Motion for Order (1) Authorizing Continued Use of Existing Business Forms and Records and (2) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System.

4. First Day Motion No. 6: Motion for Order Authorizing Payment of Installment Under Prepetition Insurance Premium Agreement.

---

[4/] (...continued)
Wulkowicz Dec. 12, ¶ 3.

## VI.

## CONCLUSION

The Creditor Trustee naturally understands the need to maintain operations for operational stores. However, to the extent the Debtors seek to make payments now of pre-petition obligations, it must show the necessity of such expenditures. The Debtors have not provided some basic information to determine if the payments are really necessary and in the best interest of the estate. The Court therefore should sparely permit the Debtor in this early stage of the case to spend cash only on pre-petition claims that are truly necessarily to the Debtor's future survival.

DATED: May 23, 2008          WEINSTEIN, WEISS & ORDUBEGIAN LLP

                              By _____Shaun 3 Wein_____
                                 Attorneys for T. Scott Avila
                                 Creditor Trustee of the Class IV
                                 Creditor Trust

# DECLARATION OF T. SCOTT AVILA

I, T. Scott Avila, declare:

1. I am the duly appointed Creditor Trustee for the Class IV Creditor Trust. If called as a witness, I could testify to all matters set forth herein based on my personal knowledge except as indicated otherwise.

2. I have reviewed the *Creditor Trustee's Omnibus Objection to Debtors' First Day Motions* (the "Objection"). All of the factual recital stated in the Objection are made of my own personal knowledge and believe.

I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Executed this 23 day of May 2008, at Los Angeles, California.

_____
T. SCOTT AVILA

# DECLARATION OF SERVICE BY MAIL

I, CLAUDEAN BRANDON, the undersigned, hereby declare:

I am employed in the County of Los Angeles, State of California by the firm of WEINSTEIN, WEISS & ORDUBEGIAN LLP, 1925 Century Park East, Suite 1150, Los Angeles, California 90067-2712. I am over the age of 18 and not a party in the within action.

On May 23, 2008, I caused to be served the foregoing document described as

*CREDITOR TRUSTEE'S OMNIBUS OBJECTION TO DEBTORS' FIRST DAY MOTIONS; DECLARATION OF T. SCOTT AVILA IN SUPPORT THEREOF*

by placing a true and correct copy of each document thereof, enclosed in a sealed envelope, addressed as follows:

[SEE ATTACHED SERVICE LIST]

( x ) I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service. I know that the correspondence is deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices in the United States mailed at Los Angeles, California.

(  ) Via Fax, I caused the above-referenced document(s) to be transmitted to the above-named persons.

( x ) Via E-Mail, On the above-mentioned date, from Los Angeles, California, I caused each such document to be transmitted electronically to the party(ies) at the e-mail address(es) indicated below. To the best of my knowledge, the transmission was reported as complete, and no error was reported that the electronic transmission was not completed.

( x ) Via Overnight Mail

(  ) (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

( x ) (Federal) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 23, 2008 at Los Angeles, California.

*/s/ Claudean Brandon*
CLAUDEAN BRANDON

h:\h\c\1570.081_obj.first.day.mtn.wpd
5/23/08 (10:45 am)

## SERVICE LIST

<u>Attorneys for Steakhouse Investors, LLC</u>
Julia W. Brand  [VIA E-MAIL] jbrand@linerlaw.com
Enid M. Colson  [VIA E-MAIL] ecolson@linerlaw.com
Liner Yankelevitz Sunshine & Regenstreif
1100 Glendon Ave 14 Fl
Los Angeles CA 90024

Office of the U.S. Trustee  [VIA OVERNIGHT MAIL]
402 W. Broadway, Suite 600
San Diego, CA 92101-8511