1

Richard J. Feferman
**CORPORATE RECOVERY ASSOCIATES**
3830 Valley Centre Drive, Suite 705-152
San Diego, CA 92130
Telephone:    +1 858 792 7473
Facsimile:      +1 858 430 2454

Financial Advisor for Official Committee of
Unsecured Creditors

2

3

4

5

6

7

8

UNITED STATES BANKRUPTCY COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

| 10 | In re | Case No.  08-04147-JM11 |
|---|---|---|
| 11 | STEAKHOUSE PARTNERS, INC., a Delaware Corporation, | Chapter 11 |
| 12 | | (Jointly Administered with Case Nos. 08-04152 JM11 and 08-04153 JM11) |
| 13 | Debtor. | |

14    In re

15    PARAGON STEAKHOUSE RESTAURANTS, INC., a Delaware Corporation,

16                                    Debtor.

17    In re

18    PARAGON OF MICHIGAN, INC., a

19    Wisconsin Corporation,

20                                    Debtor.

**FIRST AND FINAL APPLICATION FOR COMPENSATION OF FEES AND REIMBURSEMENT OF EXPENSES (AND FINAL ALLOWANCE OF SAME) OF CORPORATE RECOVERY ASSOCIATES, FINANCIAL ADVISOR FOR OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR PERIOD FROM JUNE 24, 2008 THROUGH NOVEMBER 8, 2010**

Date:      July 29, 2011
Time:     10:00 a.m.
Ctrm:     5
Judge:    Hon. James W. Meyers

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 2

II.   BACKGROUND ................................................................................................... 2

III.  THE FIRM'S RETENTION .................................................................................. 3

IV.   REQUEST FOR APPROVAL AND PAYMENT .................................................. 5

V.    SERVICES RENDERED BY THE FIRM DURING APPLICATION PERIOD ................. 6

      A.   Asset Analysis and Recovery ......................................................................... 6

      B.   Meeting of Creditors, Committee Communications, and Meetings ........................ 10

      C.   Asset Disposition ...................................................................................... 10

      D.   Business Analysis ...................................................................................... 11

      E.   Data Analysis ........................................................................................... 11

      F.   Travel ..................................................................................................... 11

      G.   Employment and Fee Applications ................................................................. 12

VI.   EVALUATING STANDARDS ............................................................................. 12

VII.  APPLICATION OF THE LODESTAR AND THE APPLICABLE  JOHNSON
      FACTORS TO THE PRESENT CASE .................................................................. 14

      A.   Time Spent. ............................................................................................. 14

      B.   The Professionals of the Firm Have Exercised a High Degree of Skill in
           Performing the Required Services. ................................................................ 14

      C.   Customary Fee for Comparable Services. ....................................................... 15

      D.   The Experience, Reputation and Ability of the Professionals Involved. .................. 16

      E.   Whether the Fee is Contingent. ................................................................... 16

      F.   The Results Obtained. ................................................................................ 17

VIII. CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Channel Master Holdings, Inc.,*
    309 B.R. 855 (Bankr. D. Del. 2004) ..................................................................18

*Cunningham v. County of L.A.,*
    879 F.2d 481 (9th Cir. 1988) .........................................................................13

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983).......................................................................................13

*In re Acme Cake Co.,*
    2010 Bankr. LEXIS 3689 (Bankr. E.D.N.Y. Oct. 18, 2010) ..........................18

*Law Offices of David A. Boone v. Derham-Burk (In re Eliapo),*
    468 F.3d 592 (9th Cir. 2006) .........................................................................13

*In re Nucorp Energy, Inc.,*
    764 F.2d 655 (9th Cir. 1985) .........................................................................12

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
    478 U.S. 546 (1986).......................................................................................13

*United States Trustee v. Knudsen Corp. (In re Knudsen Corp.),*
    84 B.R. 668 (B.A.P. 9th Cir. 1988)................................................................12

*In re Westec Corp.,*
    313 F.Supp. 1296 (S.D. Tex. 1970) ...............................................................14

*Yermakov v. Fitzsimmons (In re Yermakov),*
    718 F.2d 1465 (9th Cir. 1983) .......................................................................13

## FEDERAL STATUTES AND RULES

11 U.S.C. § 330.............................................................................................*passim*

11 U.S.C. § 1103.....................................................................................................3

Fed. R. Bankr. P. 2004............................................................................................9

Fed. R. Bankr. P. 2016............................................................................................1

## TREATISES

3 Collier on Bankruptcy, (Alan N. Resnick & Henry J. Sommer, 15th ed. rev. 2002) ...........14, 15

TO THE HONORABLE JAMES W. MEYERS, UNITED STATES BANKRUPTCY JUDGE; OFFICE OF THE UNITED STATES TRUSTEE; JAMES L. KENNEDY, CHAPTER 7 TRUSTEE, AND HIS COUNSEL OF RECORD; THE DEBTOR; AND ALL OTHER INTERESTED PARTIES:

Corporate Recovery Associates (the "Firm"), financial advisor to the Official Committee of Unsecured Creditors, (the "Committee") of the bankruptcy estates of Steakhouse Partners, Inc. ("Steakhouse"), Paragon Steakhouse Restaurants, Inc. ("Paragon") and Paragon of Michigan, Inc. ("Paragon of Michigan" and together with Steakhouse and Paragon, the "Debtors") and the Committee's counsel, hereby submits, pursuant to section 330 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); Rule 2016-3 of the Local Rules of the United States Bankruptcy Court for the Southern District of California (the "Local Bankruptcy Rules"); Guideline No. 4 of the Guidelines for Fulfilling the Requirements of the United States Trustee issued by the United States Trustee for the Southern District of California (rev. Jan. 1, 2008) (the "Local UST Guidelines"); and the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, promulgated by the Executive Office for the Office of the United States Trustee (the "UST Fee Application Guidelines"), its First and Final Application for Compensation of Fees and Reimbursement of Expenses (and Final Allowance of Same) (the "Application") for services rendered consisting of fees in the amount of $63,262.50  and expenses in the amount of $119.30 for a total amount of $63,381.80, for the period June 24, 2008 through November 8, 2010 (the "Application Period").  This amount includes $7,000 received from the Debtor in December 2008, pursuant to the Order Approving Cash Collateral Stipulation (defined below) and $4,537.50 in fees incurred in connection with the preparation of this Application.  In support of the Application, the Firm files concurrently herewith the declaration of Richard J. Feferman (the "Feferman Declaration") and respectfully represents as follows:

/ / /

/ / /

1

## I.     INTRODUCTION

These Bankruptcy Cases[1] presented certain challenges by simple virtue of when they were initiated and administered – *i.e.*, in the midst of a recession that hit the restaurant industry particularly hard.[2]  In this challenging economic climate, the Firm worked diligently to do what it could to maximize value for the estate and unsecured creditors – *e.g.*, working with the Debtors, the Committee's counsel, and the Secured Creditor Trust on the "front end" on sales of the Debtors' assets and on the "back end," investigating the D&O Claims and ultimately supporting the filing of the D&O Action, any proceeds of which do **not** constitute the Secured Creditor Trust's collateral.

This Application provides detail – both in narrative and individual time entry format – on the time spent by the Firm on these and other tasks related to the smooth and efficient administration of these Bankruptcy Cases during their Chapter 11 phase.  While these Bankruptcy Cases did not result in a plan or structured dismissal, but rather in a conversion to Chapter 7, such result should not be factored as a demerit when analyzing the reasonableness of the Firm's fees and expenses because the Bankruptcy Code uses an objective standard that does not rely on hindsight.

The Firm asserts that its fees and expenses, as set forth in the Application, are reasonable and prays that this Court grant the Application in full.

## II.     BACKGROUND

On May 15, 2008 (the "Petition Date"), the Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (together, the "Bankruptcy Cases") in the United States Bankruptcy Court for the Southern District of California (the "Court").  On May 28, 2008, the Court entered an order consolidating the Bankruptcy Cases for administration purposes only under the lead case number 08-04147.  *See* Doc. No. 37.  The Debtors are related corporations which were engaged in the operation of 19 full-service steakhouse restaurants located in Arizona, California, Indiana, Michigan, North Carolina, Ohio and Utah under the brand names Hungry Hunter, Hunter Steakhouse, Mountain Jack's and Carvers (collectively, the

---

[1] All capitalized terms used in this "Introduction" are defined below.
[2] *See, e.g.*, Andrew Martin, *Empty Tables Threaten Some Restaurant Chains*, N.Y. TIMES, Apr. 3, 2009, available at http://www.nytimes.com/2009/04/04/business/04restaurant.html (citing, *inter alia*, Outback Steakhouse as one struggling restaurant chain).

"Restaurants"). Steakhouse was publicly traded over the counter under the symbol "STKP." In December 1998, Steakhouse acquired its wholly owned subsidiary, Paragon, which owned and operated the Restaurants. Paragon has one wholly owned subsidiary, Paragon of Michigan, through which it conducted its restaurant operations in the state of Michigan and held its intellectual property and trade names. The structural maintenance of Paragon of Michigan is dictated by state alcohol laws; however, the subsidiary operations and financial results are consolidated at the Paragon level..

On June 12, 2008, the Office of the United States Trustee (the "U.S. Trustee") formed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. On that date, the U.S. Trustee appointed The Restaurant Management Group, Central Meat and Provision, Inc., and Tippecanoe Place, LLC as members of the Committee. On June 19, 2008, the U.S. Trustee also appointed Southwest Traders, Inc. and Marvin T. Levin to the Committee.

On November 8, 2010, the Court converted the Bankruptcy Cases from Chapter 11 to Chapter 7 (the "Conversion"), and the Committee was dissolved. James L. Kennedy was appointed the Chapter 7 Trustee (the "Chapter 7 Trustee") for the Debtors' estates. *See* Doc. No. 650.

On March 1, 2011, the Court entered an order setting May 31, 2011 as the deadline for creditors to file Chapter 11 administrative expense claims in the Bankruptcy Cases. *See* Doc. No. 696.

### III.    THE FIRM'S RETENTION

In June 2008, shortly after its formation, the Committee sought to retain the Firm as financial advisor and to retain Baker & McKenzie LLP ("Baker & McKenzie") as its counsel. On July 30, 2008, the Committee sought an order authorizing the employment of the Firm as its financial advisor, *nunc pro tunc* to June 24, 2008, pursuant to the applicable provisions of the Bankruptcy Code [Doc. No. 199] (the "Retention Application"). The Committee selected the Firm because of its extensive experience and knowledge in the field of bankruptcy, insolvency and distressed situations. On August 4, 2008, the Court entered an order approving the employment of the Firm, *nunc pro tunc* to June 24, 2008, pursuant to sections 1103(a) and 330 of the Bankruptcy Code [Doc. No. 205] (the "Retention Order"). A true and correct copy of the Retention Order is attached to the Declaration of

3

Richard Feferman, which is being filed in support hereof ("Feferman Decl."), as **Exhibit "1."**

This is the Firm's first and final fee application. The Firm has received no retainer in connection with its engagement by the Committee.

The Court approved the terms of the Firm's employment, including (i) the payment of the Firm's fees and related costs as administrative expenses pursuant to sections 330, 331, 503(b) and 1103 of the Bankruptcy Code; (ii) any travel, report production, delivery services, and other reasonable costs incurred in providing the services – all charged to the Committee at rates consistent with charges made to other clients of the Firm; (iii) the hourly rates for the professional representing the Committee on this matter, Mr. Richard Feferman, Senior Managing Director ($375.00 per hour); and (iv) the Firm's customary hourly rates for its professionals and staff people, which were as follows (the Firm's rate increases have not been applied to this case):

Senior Staff

Stephen P. Bick, Director ($300.00 per hour)

Alan Myers, Senior Accounting Analyst ($220.00 per hour)

Michael Willoughby, Senior Analyst ($300.00 per hour)

Staff

Associate Analysts ($125.00 - $275.00 per hour)

The Firm was retained to perform the following tasks, which it did as discussed in detail below:

a.      To provide to the Committee advice with respect to the Debtors' ongoing business operations;

b.      To assist the Committee in investigating the assets, liabilities and financial condition of the Debtors;

c.      To provide financial advisory advice and analysis regarding the sales of the Debtors' assets;

d.      To provide consulting services regarding confirmation issues, avoidance actions or other matters, if necessary; and

4

e.     Perform such other services that require financial, operational or business expertise that the Committee may require of the Firm in connection with the Debtor's Chapter 11 cases.

## IV.     REQUEST FOR APPROVAL AND PAYMENT
## OF ALL FEES AND EXPENSES FOR THE APPLICATION PERIOD

With this Application, the Firm is requesting final allowance and payment of fees in the amount of $63,262.50 consisting of 168.7 hours of billed time. Included in this fee amount is $7,000 received in or around December of 2008 (the "Received Amount").[3]  The Firm is also requesting final allowance of the Received Amount. The Firm also requests final allowance and payment of $119.30 for expenses incurred over the Application Period.

A full description of the services provided, containing a listing of the professional and staff who devoted time to each matter during the Application Period, along with their billing rates, total hours and total fees billed, is attached to the Feferman Declaration as **Exhibit "2"**. This exhibit shows the date the services were rendered, the nature of the services rendered, who rendered the services, the time required for the performance of such services, and the fee associated with each service rendered.  All services performed by the Firm's professionals were recorded in time increments of one-tenth (0.10) of an hour.  All services performed by the Firm's staff (if any) were professional in nature and, if not performed by the paraprofessionals, would have been performed by professionals.  Summaries of the expenses, which include all out-of-pocket expenses incurred by the Firm for all matters on behalf of the Committee during the Application Period, are also contained in Exhibit "2." Expenses for outside copy costs, computerized research, long distance telephone use, express delivery, travel, PACER, and courier services are billed at actual cost.  The use of email has been significant in this case, which has greatly reduced the cost of telecopies and long distance telephone use.  Courier and overnight services and telecopies were necessary when regular mail would not be adequate to complete the task in a timely manner.

---

[3] Pursuant to that certain "Order Approving Motion to Approve the Stipulation Among the Debtors in Possession and Secured Creditors T. Scott Avila, Creditor Trustee of the Class IV Creditor Trust Re: Use of Cash Collateral" [Doc. No. 444; Dec. 19, 2008] ("Order Approving Cash Collateral Stipulation"), the Debtors were authorized to pay $25,000 to the professionals retained by the Committee.  Baker & McKenzie received the full $25,000 and divided it *pro rata* with the Firm for fees and expenses incurred from retention to November 30, 2008. *See* Feferman Decl., ¶ 5.

## V.    SERVICES RENDERED BY THE FIRM DURING APPLICATION PERIOD

Pursuant to Local Bankruptcy Rule 2016-2(b), the following chart substantially conforms to Local Form CSD 1143:

| CATEGORIES | FIRST AND FINAL PERIOD JUNE 24, 2008 to NOV. 8, 2010 | |
| --- | --- | --- |
| | Number of Billed Hours | Fees Requested |
| Asset Analysis and Recovery | 33.6 | 12,600 |
| Meeting of Creditors, Committee Communications, and Meetings | 24.2 | 9,075.00 |
| Asset Disposition | 83.1 | 31,162.50 |
| Business Analysis | 8.2 | 3,075.00 |
| Data Analysis | 1.9 | 712.50 |
| Travel | 5.6 | 2,100.00 |
| Employment and Fee Applications | 12.1 | 4,537.50 |
| **SUBTOTAL** | **168.7** | **$63,262.50** |
| **TOTAL** | **168.7** | **$63,262.50** |

Set out below is a narrative explanation, broken down by matter, of the services performed by the Firm during the Application Period.

### A.    Asset Analysis and Recovery

**Hours Expended:    33.6**

**Fees Requested:    $12,600.00**

One of the primary objectives of the Firm's retention by the Committee was for the Firm to provide financial advisory advice and analysis regarding the sales of the Debtors' assets.  The Debtors and the Committee immediately analyzed the Debtors' assets and determined that sale of the Debtors – if possible – would maximize the value of the estate.

The Firm assisted in the Debtors' retention of Real Capital Markets ("RCM"), which is an online company that facilitates similar sales of assets.  RCM started as a platform that tracks sales of real property in the U.S. over $5 million, obtains agreements from potential buyers that are interested in similar properties and agree to accept solicitations from RCM.  As part of that process, after

buyers receive solicitations, if they are interested in an offer, the buyers execute nondisclosure agreements and are provided with data about the transaction in an electronic "data room."

RCM expanded its business model to seek to develop a similar process for sales of other assets, such as private equity and assets in bankruptcy. The Firm negotiated to have RCM take on the Debtors as a client to use RCM's service to market their assets and spent significant time aiding the Debtors in obtaining the information needed to populate the online data room. In particular, the Firm met with the Debtors and their counsel and management, obtained the documents needed for buyers to evaluate the business, and oversaw the inclusion of that information in the data room. This was especially challenging due to the Debtors' limited information technology resources and systems. The Firm worked with the Debtors' representatives to develop the financial data required for the RCM data room to market the business.

The Firm also worked with RCM to create a list of potential buyers, private equity investors, restaurant operators, single tenants, and investors in single tenant properties. With RCM's service, the Debtors contacted about 70,000 potential buyers and entered approximately 80 nondisclosure agreements with interested purchasers. The Firm aided in monitoring use of the data room by potential buyers to help identify those that should be pursued most seriously.

The Firm also worked with the Secured Creditor's financial advisor (CRG) in helping the Debtors implement an accounting system and a system for providing data that would support a sale and monitoring the Debtors' cash flow.

In addition, the Firm's analysis supported the Committee's negotiations for global resolution ("Global Resolution") of the Bankruptcy Cases with the Debtors and the Secured Creditor Trust and of that certain adversary proceeding initiated by the Debtors against the Secured Creditor Trust for surcharge of certain administrative expenses (Adv. Proc. No. 09-90163) (the "Adversary Proceeding"). Therein, the Debtors sought to surcharge the collateral of defendant T. Scott Avila, as Creditor Trustee of the Class N Creditor Trust and the Class IV Creditor Trust (collectively, the "Creditor Trust") pursuant to the provisions of section 506(c) of the Bankruptcy Code, for the expenses associated with the sale of the secured creditor's collateral. These expenses included but are

not limited to, the expenses incurred by the Debtors to operate their restaurants as going concerns to maximize the value of the collateral and services rendered by various estate professionals (including the Firm) to preserve and sell the Debtors' restaurants and other assets to various third parties.  In particular, during the pendency of the Bankruptcy Cases, the Debtors requested that the professionals (including the Firm) refrain from filing monthly interim fee applications so that the Debtors might retain those monies with the company for ongoing operations. The Debtors believed that maintaining the company as a whole would make it more attractive to potential buyers. To their detriment, the professionals (including the Firm) acquiesced to this request. Had the Firm not chosen to assist the Debtors and the Secured Creditor Trust (thus benefiting the secured creditor by maximizing value), the Firm would have filed regular monthly fee applications (as authorized by court order) and likely have little to no outstanding accounts receivable.  Thus, but for the expenditure of estate funds to operate the restaurants and the services of the Estate professionals during the Bankruptcy Cases, the Debtors' restaurants would have ceased operations and the Creditor Trust's collateral would have been sold for very little value in a piecemeal liquidation. Unfortunately, due to the Conversion, the Global Resolution was never consummated.[4]

The Firm has closely worked in tandem with Baker & McKenzie to review and analyze financial information, pleadings and communications with respect to, among other things, the Debtors' proposed sales of assets, creditors' claims for administrative expenses, creditors' requests for relief from stay and resolution of the Adversary Proceeding – all with a strategic eye towards maximizing value for unsecured creditors.

This category also includes time spent by the Firm researching, analyzing and aiding in prosecution of the estates' claims against the Debtors' officers and directors for, among other causes of action, breach of fiduciary duty (the "D&O Claims").  Soon after its retention was approved, the Firm in support of Baker & McKenzie began conducting research and due diligence on the soundness, strength of and potential recoverability on the D&O Claims.  The Firm met with the Debtors' Chief Executive Officer and documented that he was not working full time on the Debtors'

---

[4] As explained below, this failure by the parties to consummate the Global Resolution is not a factor in approving or disapproving this, or any other estate professional's, Application.

8

business, which supported the D&O lawsuit.  On January 15, 2009, Baker & McKenzie tendered a demand letter to the Debtors, requesting authority to pursue the D&O Claims.  When that request proved futile, the Firm provided support to Baker & McKenzie, which filed a motion with the Bankruptcy Court on February 6, 2009 for an order delegating to the Committee the sole authority for prosecuting the D&O Claims on behalf of and for the benefit of the estate (the "D&O Claims Motion").  *See* Doc. No. 476.  After notice and hearing, the D&O Claims Motion was granted, and an order (prepared by the Firm) was entered by the Bankruptcy Court on March 25, 2009 (the "D&O Claims Order").  *See* Doc. No. 530.

After entry of the D&O Claims Order, the Firm supported Baker & McKenzie's filing of an ex parte application under Federal Rule of Bankruptcy Procedure 2004 for an order compelling the discovery of information and documents of Stone Douglass ("Douglass"), the Debtors' President, Chief Executive Officer and Chairman of the Board and any other person with relevant knowledge (the "2004 Motion").  *See* Doc. No. 537.  The 2004 Motion was unopposed (*see* Doc. No. 550), and the Bankruptcy Court duly entered an order granting the 2004 Motion on April 24, 2009 (*see* Doc. No. 552).

Earlier in the case, as a result of the Firm's efforts, a document retention and storage plan was put in place by the Debtors, and it was reported that a large number of the Debtors' documents were placed in storage and inventoried by them as a result.  These documents were used by Baker & McKenzie to conduct the deposition of Douglass on June 25, 2009 and to draft a complaint against the Debtors' directors and officers (the "D&O Complaint").[5]

Finally, this category also captures time spent by the Firm, in consultation with Baker & McKenzie, on analysis of claims by various administrative creditors, the Secured Creditor Trust and certain taxing authorities.

---

[5] The D&O Action is still pending in the State Court.  After the Conversion (and dissolution of the Committee), the responsibility for prosecution of the D&O Action passed to the Chapter 7 Trustee, who will, by his counsel and in his sound business judgment, either substitute in as the plaintiff in the D&O Action or abandon it.  Due to the pending nature of the D&O Action, certain sensitive information dealing with the Committee's strategy with respect to the D&O Action, has been redacted in Exhibit 2.  Upon request by the Court, the U.S. Trustee and/or the Chapter 7 Trustee, the Firm will provide the unredacted version of Exhibit 2.

9

**B.**    **Meeting of Creditors, Committee Communications, and Meetings**

**Hours Expended:**    **24.2**

**Fees Requested:**    **$ 9,075.00**

This category is comprised of time spent by the Firm communicating with the Committee, its counsel and creditors in this case. Prior to the Conversion, the Firm regularly communicated with Committee members and Baker & McKenzie about various aspects of the Bankruptcy Cases – whether in the form of conference calls or e-mail correspondence as well as preparation for the meeting of creditors. This category contains time spent by the Firm (i) preparing for those Committee conference calls; (ii) responding to Committee members' inquiries and counsel's inquiries; and (iii) providing financial analysis in support of case strategies going forward, including with respect to litigation against the Debtors' directors and officers.

The Firm also engaged in communications between Baker & McKenzie and the Committee, with respect to various financial analyses provided by the Firm.

**C.**    **Asset Disposition**

**Hours Expended:**    **83.1**

**Fees Requested:**    **$ 31,162.50**

The Firm has included in this category all of the Firm's time related to the Committee's participation in the process of liquidating all of the Debtors' assets (*e.g.*, restaurant locations, liquor licenses, FF&E, etc.), including analyzing leases to be assumed and assigned, coordinating closely with the service provider of the virtual data room as well as Baker & McKenzie with respect to marketing of the Debtors' assets.

This project category also includes time spent by the Firm extensively consulting with Baker & McKenzie, representatives and counsel for the Debtors and counsel for the Secured Creditor Trust on the strategy and status of the various sales. The Firm closely monitored the sales process, including providing constructive criticism and input to the Debtors regarding the content and traffic in the virtual data room, and assisted with due diligence on the *bona fides* of any and all prospective

10

purchasers and their interest in a transaction with the Debtors, to ensure maximization of value for the benefit of unsecured creditors.

### D.    Business Analysis

**Hours Expended:**    **8.2**

**Fees Requested:**    **$ 3,075.00**

This category is comprised of time that the Firm spent analyzing, addressing and conferring with the Committee and the Debtors on numerous issues relating to their business and operations in chapter 11. Among other things, the Firm's services in this category included (1) analysis and consultation relating to the Debtors' budgeting and use of cash collateral; (2) analyzing actual results; (3) reconciliation to bank activity; (4) performing liquidation analyses and analyzing lender collateral positions; (5) analyzing accounts receivable collections; (6) reviewing SOFAs and schedules; (7) assisting in preparing operating projections for potential buyers; (8) assisting in and preparation of analyses requested by the Committee; (9) analyzing the effect of the disposition of assets, and (10) analyses to support the sales of these assets to maximize value to creditors.

### E.    Data Analysis

**Hours Expended:**    **1.9**

**Fees Requested:**    **$ 712.50**

This category is comprised of time spent by the Firm reviewing and analyzing the Debtors' information systems and advising on changes to make the Debtors' records useful in the event of a sale or other transaction.

### F.    Travel

**Hours Expended:**    **5.6**

**Fees Requested:**    **$ 2,100.00**

This category is comprised of time spent by the Firm traveling to and from meetings with the Committee, its counsel, the Debtors and other service providers to the Debtors when physical meetings were believed to be of benefit instead of communication by electronic mail or telephone.

11

**G.      Employment and Fee Applications**

      **Hours Expended:      12.1**

      **Fees Requested:      $ 4,537.50**

Time under this category relates to preparation and filing of the Firm's employment application and supporting documents and preparation of this Application.

## VI.      EVALUATING STANDARDS

*Section* 330 of the Bankruptcy Code authorizes compensation for professionals rendering services in connection with a bankruptcy case. *See, e.g., United States Trustee v. Knudsen Corp. (In re Knudsen Corp.)*, 84 B.R. 668 (B.A.P. 9th Cir. 1988).

The responsibility for determining reasonable compensation under *section* 330 of the Bankruptcy Code for services rendered to the estate rests with the bankruptcy court and the court's decision is final unless there is an abuse of discretion. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 657 (9th Cir. 1985). *Section* 330(1)(a)(1)(A) provides that "reasonable compensation" be awarded "for actual, necessary services." In determining the amount of reasonable compensation to be awarded, the court is to consider "the nature, the extent, and the value of the services rendered." In connection therewith, the court is to take into account "all relevant factors," including

A.      the time spent on such services;

B.      the rates charged for such services;

C.      whether the services were necessary to the administration of or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

D.      whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

E.      with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

F.      whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

1

2        *Section* 330 otherwise provides that compensation is not allowed for unnecessary duplication

3 of services or services that were not reasonably likely to benefit the debtor's estate or necessary to

4 the administration of the case.

5        In the Ninth Circuit, the primary method used to determine a reasonable fee in bankruptcy

6 cases is to calculate the lodestar. *See Law Offices of David A. Boone v. Derham-Burk (In re Eliapo)*,

7 468 F.3d 592, 598 (9th Cir. 2006); *Yermakov v. Fitzsimmons (In re Yermakov)*, 718 F.2d 1465, 1471

8 (9th Cir. 1983).[6] A court computes the lodestar by multiplying the number of hours reasonably

9 expended by a reasonable hourly rate. *Yermakov*, 718 F.2d at 1471; *see Hensley v. Eckerhart*, 461

10 U.S. 424, 433 (1983) (reasoning that the lodestar "calculation provides an objective basis on which

11 to make an initial estimate of the value of a lawyer's services").

12        Once the lodestar is established, there is a strong presumption that the lodestar figure

13 represents a reasonable fee which should be adjusted only in rare or exceptional cases. *Cunningham*

14 *v. County of L.A.*, 879 F.2d 481, 488 (9th Cir. 1988). The Supreme Court explained the basis for this

15 presumption:

16          [W]hen an attorney first accepts a case and agrees to represent the
client, he obligates himself to perform to the best of his ability and to

17          produce the best possible results commensurate with his skill and his
client's interests. Calculating the fee award in a manner that accounts

18          for these factors, either in determining the reasonable number of hours
expended on the litigation or in setting the reasonable hourly rate, thus

19          adequately compensates the attorney, and leaves very little room for
enhancing the award based on his post-engagement performance. In

20          short, the lodestar figure includes most, if not all, of the relevant
factors constituting a "reasonable" attorney's fee, and it is unnecessary

21          to enhance the fee for superior performance in order to serve the
statutory purpose of enabling plaintiffs to secure legal assistance.

22 *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565-66 (1986).

23        In this Application, the Firm is not seeking any upward adjustment in the "lodestar" approach

24 to its fee request. The requested fees in this Application are the product of the number of the hours

25 expended by the Firm's professionals in representing the interests of the Committee multiplied by

26 their respective hourly rates. In addition, the Firm has not charged for word processing services or

27

---

28 [6] The lodestar approach, however, is not the exclusive method for calculating fees. *Eliapo*, 468 F.3d at 598 (stating that "the lodestar method is not mandatory").

13

secretarial overtime, although the firm bills its non-bankruptcy clients for such items.

## VII.    APPLICATION OF THE LODESTAR AND THE APPLICABLE
*JOHNSON* FACTORS TO THE PRESENT CASE

### A.    Time Spent.

As noted above, the first element to be considered in determining the reasonableness of compensation under section 330(a)(3)(A) is the amount of time consumed in rendering the services for which compensation is sought.  Section 330(a)(3)(D) requires that a court determine whether the services were performed within a reasonable amount of time based upon the complexity, importance, and nature of the issue.  In this respect, courts have required professionals seeking payment to provide accurate records of the amount of time spent and the manner in which it was spent, based upon detailed, contemporaneous time records that reveal enough information to enable the court to make an informed judgment about specific tasks and the time allotted.

The Firm's time records, copies of which are attached to the Feferman Declaration as Exhibit "2" and incorporated herein by reference, demonstrate that during the Application Period the Firm spent a total of 152.1 hours in representing the Committee.  The Firm submits that a review of its time records will disclose that all of the time spent was reasonable and necessary for the adequate representation of the Committee as its financial advisor in connection with the matters for which the Firm was employed.

### B.    The Professionals of the Firm Have Exercised a High
Degree of Skill in Performing the Required Services.

Part and parcel of the analysis of the quantity of time spent is also the quality of services provided.  Indeed, many courts recognize that a strict adherence to time alone, without consideration of other factors, would not be fair.  *See, e.g., In re Westec Corp.*, 313 F.Supp. 1296 (S.D. Tex. 1970). As stated in *Collier on Bankruptcy*:

> [a]lthough the number of hours fairly and properly devoted to a case may aid the court in arriving at a reasonable compensation, it should not serve as one of the predominant considerations.  Undue emphasis on the factor of the "time spent" fails to acknowledge the fact that skill and experience may accomplish much in a short period of time. …

14

> Focus on the hours expended by a professional also may ignore the
> fact that some services are routine and ordinary while others involve
> complex and difficult issues.

3 A. Resnick & H. Sommer, eds., COLLIER ON BANKRUPTCY, ¶ 330.04[4][d] (15th ed. rev. 2002).

Throughout the Application Period, there were multiple critical aspects of the case that required significant attention, including consummation of the various sales of the Debtors' assets and extensive negotiation with the Debtors and the Secured Creditor Trust of the Global Resolution; in-depth discovery, research and financial analysis with respect to the D&O Action, which was and remains property of the estates unencumbered by the Secured Creditor Trust's lien; and all preparatory activities incidental to all of the foregoing matters.

Additionally, the Firm actively communicated and strategized with Baker and McKenzie and the Committee in an effort to effectively respond to all aspects of these Bankruptcy Cases in a manner designed to enhance recovery of estate assets and maximization of value.[7]

The Firm has continued to draw on its experience and competency in resolving complex issues and deftly handling numerous developments during the span of its engagement. The Firm has used discretion, good judgment and worked efficiently to handle the issues that have arisen in this case.

### C.    Customary Fee for Comparable Services.

Section 330 of the Bankruptcy Code requires that the bankruptcy court award fees in bankruptcy cases based upon the costs of similar services rendered in non-bankruptcy cases. This requirement is a departure from prior law governing the allowance of compensation. The drafters of the Bankruptcy Code abandoned the notions of conservation of the estate and economy of administration, which were pivotal concepts in assessing compensation under the prior Bankruptcy Act. Rather, Congress attempted to attract bankruptcy law specialists to make the adjudication of bankruptcy cases more efficient. As noted in *Collier on Bankruptcy*:

---

[7] As discussed in more detail below under the subheading "Results Obtained," the Conversion is not a factor the Court should use to analyze the reasonableness of this Application.

15

> ...the change was based on the fundamental economic principle that the payment of arbitrarily lower rates to lawyers in bankruptcy proceedings compared to market-established rates for non-bankruptcy legal service would cause attorneys to leave bankruptcy practice or to refrain from entering bankruptcy practice. An inherent risk in this system, as recognized by Congress, is that creditors would have to absorb the cost of improper and inefficient administration.

3 COLLIER ON BANKRUPTCY, 330.04[6][a] at 330-59.

The Firm's recap of services rendered, attached hereto as **Exhibit "2"**, depicts the hourly rates charged by the professionals and staff in the Firm as well as the actual total time spent by each of them for services provided in this case. These rates are comparable to the rates the Firm charges its non-bankruptcy clients.

### D.    The Experience, Reputation and Ability of the Professionals Involved.

The qualifications of the Firm's professionals and staff performing services on behalf of the Committee are set forth in **Exhibit "3"** attached hereto. The Firm believes that each of the persons listed on **Exhibit "3"** is highly qualified to perform the services rendered on the Committee's behalf and have billing rates commensurate with similarly qualified individuals. The Firm submits that it has a well-earned reputation for providing quality financial advisory services.

### E.    Whether the Fee is Contingent.

In its application to retain the Firm, the Committee sought and the Court approved compensation for the Firm as an administrative expense on an hourly basis, plus reimbursement of actual, necessary expenses actually incurred by the Firm. In one sense, however, representation of statutory parties in every bankruptcy case is contingent. The contingent nature depends on the availability of estate assets to satisfy administrative claims.

In this case, whether the sale of the Debtors' assets would satisfy in full the Secured Creditor Trust's debt was uncertain, and the Debtor did not have sufficient liquid assets at the time of the Firm's retention to pay administrative claims, and so the degree of risk to the professionals involved was significant. Since the Bankruptcy Cases have been converted to Chapter 7 and have thus added another layer of administrative expenses, the risk of non-payment to Chapter 11 professionals is

16

even higher.

The Firm advised the Committee and provided financial analysis and support towards its goal of selling the Debtors' assets (*i.e.*, the restaurants), investigating the liability of the Debtors' directors and officers, and maximizing value for the estate. The sale of assets is now complete; the D&O Action has been initiated. However the net sale proceeds, the eventual proceeds, if any, recoverable on the D&O Action, and the ultimate amount of the Chapter 7 Trustee's fees and expenses remain unknown. Therefore, there is a high risk to The Firm that the estate will not recover sufficient proceeds to pay all administrative claims – whether in Chapter 7 or Chapter 11. In addition, the Firm and the other professionals acquiesced to the Debtors' request that they refrain from filing monthly interim fee applications so that the Debtors might retain those monies with the company for ongoing operations. Had the Firm not chosen to assist the Debtors (thus benefiting the secured creditor by maximizing value), the Firm would have filed regular monthly fee applications (as authorized by court order) and likely have little to no outstanding accounts receivable. Thus, but for the expenditure of estate funds to operate the restaurants and the services of the Estate professionals during these bankruptcy cases, the Debtors' restaurants would have ceased operations and the Creditor Trust's collateral would have been sold for very little value in a piece- meal liquidation.

### F.    The Results Obtained.

In this Application, the Firm has set forth in some detail the activities undertaken and the results obtained by the Committee, its counsel and the Firm. The Committee has been an active protector of the interests of unsecured creditors in a very challenging economic environment. By quickly assimilating and analyzing the complex issues in the case, the Committee and its professionals attempted to maximize the value of the estate for all parties by facilitating the expeditious sale of the Debtors' assets, participating in the formulation and advancement of the Global Resolution as an efficient exit vehicle from the bankruptcy, investigating the D&O Claims and ultimately facilitating the prosecution of the D&O Action **exclusively** on behalf of the estate and its unsecured creditors, and investigating claims against the Secured Creditor Trust.

17

The Conversion, however, should not be used as a measuring stick in determining whether the Firm's time and efforts were well-spent or, more importantly, whether the Firm and the Committee successfully fulfilled their fiduciary duties to unsecured creditors. This is so because "in evaluating the award of professional fees, courts **objectively** consider whether the services rendered were reasonably likely to benefit the estate **from the perspective of the time when such services were rendered**." *In re Acme Cake Co.*, 08-41965-CEC, 2010 Bankr. LEXIS 3689, *14 (Bankr. E.D.N.Y. Oct. 18, 2010) (emphasis added) (quoting *In re Value City Holdings, Inc.*, 08-14197-JMP, 2010 Bankr. LEXIS 3111, *3 (Bankr. S.D.N.Y. Sept. 22, 2010)). In short, "[r]easonableness of services is not determined through hindsight." *Id.* at *15 (citation omitted) (committee counsel not penalized for time spent on discovery and litigation regarding claims against insiders that were never brought); *see also In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861-62 (Bankr. D. Del. 2004) ("Section 330(a)'s 'benefit' and 'necessary' criteria do not require a professional to be 100% successful") (quoting *In re Cenargo Int'l, PLC*, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003)).

Based on the foregoing, the Firm should be awarded its requested fees, as they are the product of actual and necessary services rendered by the Firm and based upon reasonable amounts of time spent on such services multiplied by a reasonable hourly rate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

3                              **VIII.   CONCLUSION**

4          WHEREFORE, the Firm requests this Court to enter an order as follows:

5          1.      Approving and awarding as a final payment, fees of $63,262.50 and reimbursement

6    of costs of $119.30 for a total amount of $63,381.80; and

7          2.      Granting such other and further relief as is just and proper.

8

9

10   Dated:  May 27, 2011                          Corporate Recovery Associates

11

12                                                 By:

13                                                 Richard J. Feferman
                                                   Financial Advisors for the Official
14                                                 Committee of Unsecured Creditors

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              19